IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BOUNNHONG DOUANGPANGNA,

    Petitioner,                       No. CIV S-01-0764 GEB JFM P

    vs.

MIKE KNOWLES, Warden,          <u>ORDER AND</u>

    Respondents.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] Petitioner challenges his 1998 conviction on charges of second degree murder with enhancements for personal use of a firearm and discharging a firearm causing injury. Petitioner claims that his constitutional rights were violated by (1) the trial court's failure to give a jury instruction on petitioner's theory of the case; (2) a

/////

/////

---

[1] Recent court orders served on petitioner's address of record have been returned by the U.S. postal service. It appears that petitioner has failed to comply with Local Rule 83-182(f), which requires that a party appearing in propria persona inform the court of any address change. Petitioner is cautioned that sanctions may be imposed for failure to comply with the Local Rules of Court. <u>See</u> Local Rule 11-110.

supplemental instruction given by the trial court after six and one-half hours of deliberation;[2] and (3) the trial court's failure to give sua sponte an antecedent threats jury instruction.

FACTS[3]

There is no dispute that on April 4, 1998, [petitioner] shot and killed Khamphet Chanthavong. The facts at issue involve [petitioner]'s mental state at the time of the shooting.

[Petitioner] married Loommany Douangpangna in 1975 in a refugee camp in Thailand. They divorced in 1996. Loommany moved out of their home and obtained a restraining order against [petitioner]. Their two children continued to reside with [petitioner]. Neither Loommany nor the children told [petitioner] where Loommany was living.

[Petitioner] was distraught. Loommany testified [petitioner] threatened to kill her and her new boyfriend, Khamphet, saying such things as he wanted to "blow [their] blood out" and he would not let her and her boyfriend live in peace. He repeated the threats many times on the telephone, and left at least two messages on Loommany's telephone answering machine threatening to kill her and her boyfriend.

Loommany and [petitioner]'s daughter, Bobby, corroborated her mother's testimony that [petitioner] threatened to kill them many times. Bobby heard her father threaten to kill Khamphet more than 10 times. She also heard him threaten to kill her mother. When he was drinking he often said things like, "If I see them, I'm going to kill both of them, shoot both of them in the head, I don't care what anybody else says, I'm going to do it."

On April 4, Loommany and Khamphet stopped in Stockton on their way to Sacramento to have lunch with some of Khamphet's relatives. Loommany did not know in advance that Khamphet was going to stop in Stockton. Bobby came home from a friend's house around 10:40 a.m., saw her father dressed in his work attire, and heard him say something like, "Man, I don't care about anything, nothing's going to stop me."

Various witnesses saw Loommany and Khamphet leaving am apartment when [petitioner] stopped his truck and ran after Khamphet with a gun in his hand. Loommany heard [petitioner]

---

[2] Petitioner raises three separate claims of error from the supplemental jury instruction.

[3] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Douangpangna, No. C031036 (Oct. 11, 2000), a complete copy of which was filed by respondents on February 9, 2007.

say, "I'm going to kill you today." She saw Khamphet run toward the apartment and say, "Calm yourself down and we [can] talk about it."

[Petitioner] chased Khamphet to the apartment, where, according to an 11-year-old neighbor, Khamphet tried unsuccessfully to open the door. She heard the man who was unable to get into the apartment say "stop" several times in Laotian. Her brother testified the victim looked "very scared" and [petitioner] looked "really mad." According to this witness, it looked as though the victim was attempting to avoid the gun, and at one point, it looked as though he attempted to grab it or to move it away.

[Petitioner] shot Khamphet three times. The coroner believed the last shot was the fatal shot to the head. [Petitioner] put the gun into the bag he was carrying, ran to the driver's side door of his white pickup, attempted to open the door from the outside, ran to the passenger side of the pickup, threw the bag into the truck, crawled through the passenger side into the driver's side, and sped away. He spent the night with friends and told them he had killed his ex-wife's boyfriend with a gun. His friends did not believe him until the next morning when they saw a story about the shooting on the news. [Petitioner] did not say why he killed the victim.

[Petitioner] testified on his own behalf. He believed the victim had put him under a black magic spell about 15 months before the shooting. At that time, the victim gave him a liquid, which [petitioner] drank. He thereafter felt different, "heavy," and like the world was on his shoulders. A week after he drank the liquid, [petitioner] ate some fish Loommany brought him, which also affected the way he felt. He was sad and confused and had difficulty sleeping and eating. Because of his familiarity with black magic as a child in Laos, he believed the victim had put him under a black magic spell.

He sought help at a temple, where he was told that Khamphet had evil spirits. However, he could not afford the recommended treatment. He testified that evil spirits can kill people over a long period of time; if the person was not dead in three months, he would die within six months, and if not within six months, he would die within a year.

[Petitioner] claimed the victim had threatened him over the telephone for approximately a year although he did not tell anyone about these conversations. Ultimately, he bought a gun for his own protection.

He testified the victim wanted to meet him at the apartment in Stockton on April 4. The victim told him he had a gun and would not die because he had black magic to protect himself. He agreed

to meet him even though he was afraid.  When he saw the victim walking with Loommany, he stopped and got out of his truck. [Petitioner] saw the victim try "to look for something" in his jacket and he thought the victim was going to take out a gun.  The victim reached for [petitioner]'s gun and yelled in Laotian, "Mother fucker."  [Petitioner] testified he grabbed the gun and shot the victim in self-defense.  He believed that if he did not shoot the victim, the victim would "probably kill met later . . . then I probably die later on."  He buried the bag with the gun inside it behind the temple.

A cultural anthropologist testified about commonly held Laotian beliefs in black magic.  According to the anthropologist, a majority of people in Laos still believe black magic exists, and many of those who migrate to the United States retain their belief that sorcerers can use bad spirits with black magic.  These sorcerers can use black magic to put a spell on someone by giving the person a liquid or by obtaining a personal item, such as hair or clothing.  If the victim of the black magic is unable to get relief from the spell, he or she might die.  It is also a commonly held belief that a sorcerer can kill the victim through use of a spell.

The anthropologist remembered seeing three persons under the influence of spells when he was a young boy in Laos.  He had not encountered a person under a spell in the United States since his arrival in this country approximately 15 years earlier.  He testified that a person from Laos who believes in Buddhism or black magic can experience feelings of jealousy and that a Laotian man who learned his ex-wife was having sex with another man might become "sad, mad or angry."

(People v. Douangpangna, slip op. at 1-5.)

## ANALYSIS

### I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

4

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

    A. General Standards

All three of petitioner's claims challenge jury instructions given or omitted by the trial court. A challenge to jury instructions does not generally state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th

Cir. 1983). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).

Petitioner's burden is "especially heavy" when the court fails to give an instruction. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). In order to warrant federal habeas relief, a jury instruction error must have "'so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).

  B. Failure to Instruct on Defense Theory

Petitioner's first claim is that the trial court erred in failing to give a jury instruction requested by the defense that went to the heart of his defense. This claim was raised and rejected by the state courts on direct appeal from petitioner's conviction. (See Exs. E, F and G to Answer.) The last reasoned rejection of the claim is the decision of the California Court of Appeal for the Third Appellate District. (See People v. Douangpangna, slip op. at 13-17.) The state court set forth the relevant facts, as follows:

> [Petitioner] requested a pinpoint instruction to allow the jury to correlate the evidence of Laotian cultural beliefs to his mental state. The instruction reads: "You have received evidence of [petitioner]'s cultural background and the relationship of his culture to his mental state. You may, but are not required, to consider that evidence in determining the presence or absence of the essential mental states of the crimes defined in these instructions, or in determining any other issue in this case." The trial court refused to give the defense instruction.

(Id. at 13-14.) Applying state law standards, the court of appeal found that the trial court erred in

refusing to give the requested instruction.

> A defendant is entitled, upon request, to an instruction that relates the evidence to any legal issue or pinpoints the crux of a defendant's case. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885; *People v. Sears* (1970) 2 Cal.3d 180, 190.) While the court must give a defense instruction that pinpoints the theory of the defense, it may refuse an instruction that is argumentative. (*People v. Earp* (1999) 20 Cal.4th 826, 886.) The Attorney General insists [petitioner]'s proffered instruction is argumentative and cumulative. We disagree.
>
> We conclude the instruction does not, as the Attorney General contends, invite the jury to draw inferences favorable to the defense from specified items of evidence. (*People v. Earp*, *supra*, 20 Cal.4th at p. 886.) It does not, in fact, point to any specified items of evidence. It does allude to the crux of the defense, that is, "defendant's cultural background and the relationship of his culture to his mental state." The language itself is not argumentative. The instruction simply permits the jury to "consider that evidence in determining the presence or absence of the essential mental states of the crimes defined in these instructions . . . ."
>
> Nor do we find the instruction cumulative. While the jury was indeed instructed on the law of self-defense and imperfect self-defense, the court did not provide an analytical vehicle for applying the evidence on Laotian cultural acceptance of black magic to the elements of murder or manslaughter. The instructions are completely devoid of any directive to the jury regarding the appropriate use of cultural evidence about [petitioner]'s belief in the powers of black magic to destroy those who are under such a spell. We agree that the application of the cultural evidence to [petitioner]'s mental state at the time of the crime requires the jury to understand [petitioner]'s subjective frame of mind as a person steeped in Laotian culture. Since the cultural anthropologist's testimony supports the defense theory that Laotians genuinely fear the potency of black magic spells, [petitioner] was entitled to clarify the relevancy of the cultural evidence to a determination of his actual mental state at the time of the shooting.

(<u>Id</u>. at 14-15.) The trial court also found, however, that under applicable state law standards the error was harmless. The court made the following specific findings:

> First, the evidence of guilt was powerful. [Petitioner] clearly had a compelling motive to avenge the man who had stolen his wife's affections, and for over a year he repeatedly threatened to kill Loommany and the victim.[Petitioner]'s conduct during the shooting suggested that he, not the victim, was the aggressor. By his own admission, he went to the neighborhood to meet the victim. Eyewitnesses observed him stop his truck, chase the

victim, and ignore pleas to stop. They saw the victim running away and attempting to retreat into the apartment. Even if the jury accepted [petitioner]'s testimony that he was under a black magic spell, the evidence that he was in fear of impending death was slim. [Petitioner] sought out Loommany and the victim even though he was aware of the restraining order against him. Moreover, his conduct following the shooting was inconsistent with his cultural defense. He fled the scene, buried the gun, and spent the night with friends, but never mentioned he shot the victim because he was under a black magic spell.

Secondly, defense counsel argued that [petitioner]'s cultural background could be considered in determining the presence of a mental state or whether he was in actual fear of the victim. She argued in relevant part: "[I]t's not a question of whether you really believe that there was black magic, but [[petitioner]] believed black magic because of his culture, because of his background . . . ." Without question, effective advocacy does not replace proper instructions. Argument can, however, help the jury focus on the evidence pertinent to the theory of the defense and minimize the potential for harm. . . .

Third, the jury was provided with a full complement of instructions on the elements of murder and manslaughter as well as the elements of justifiable homicide in self-defense and on the actual but unreasonable belief in the necessity to defend. The court instructed on concepts relevant to justifiable homicide in self-defense.

(Id. at 15-17 (Citations to specific jury instructions omitted).)

The federal due process clause protects the right of a criminal defendant to jury instructions that present the crux of his defense.

The Supreme Court has held: "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (emphasis added).

Thus, [a] state court's failure to correctly instruct the jury on the defense may deprive the defendant of his due process right to present a defense. See Barker v. Yukins, 199 F.3d 867, 875-76 (6th Cir.1999) (granting habeas relief under AEDPA because the erroneous self-defense instruction deprived the defendant's of a "meaningful opportunity to present a complete defense") (relying on Trombetta, 467 U.S. at 485, 104 S.Ct. 2528), cert. denied, 530

> U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). This is so because the right to present a defense "would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense." Tyson v. Trigg, 50 F.3d 436, 448 (7th Cir.1995).

Bradley v. Duncan, 315 F.3d 1091, 1098-99 (9th Cir.2002).  But there is no entitlement to tailor-made instructions that pinpoint certain aspects of the defense.  See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1570 (9th Cir.1989) (internal citation omitted) ("Indeed, '[s]o long as the instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion.'"); see also United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir.1996).  Relief is available for this type of due process violation only if the failure "had a 'substantial or injurious effect in determining the jury's verdict.'"  Bradley, at 1099 (quoting California v. Roy, 519 U.S. 2, 6 (1999)).

      The cultural evidence offered by petitioner went to his mental state at the time the victim was killed.  (See Reporter's Transcript of Proceedings (RT), at 621.)  As the state court of appeal found, "the jury was provided with a full complement of instructions on the elements of murder and manslaughter as well as the elements of justifiable homicide in self-defense and on the actual but unreasonable belief in the necessity to defend."  (People v. Douangpangna, slip op. at 16; see also Clerk's Transcript on Appeal (CT), at 176-206.)  The instruction requested by petitioner was a pinpoint instruction to which there is no entitlement under principles of federal constitutional law.  The error cited by the state court of appeal was one of state law, not a violation of the federal due process clause.  Errors of state law are not cognizable in federal habeas corpus proceedings except where the errors are so egregious that they render a trial "fundamentally unfair."  See Estelle v. McGuire, 502 U.S. at 72-73.  After careful review of the record herein, this court finds that the failure to give the pinpoint instruction requested by petitioner did not render his trial fundamentally unfair.

/////

/////

For the foregoing reasons, this court finds that the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established principles of federal law.  The claim should be denied.

C. Supplemental Instruction

Petitioner's second claim is that his constitutional rights were violated by a supplemental instruction given to the jury after six and one-half hours of deliberations.  The last reasoned rejection of this claim is the decision of the state court of appeal, which set forth the relevant facts as follows:

> [Petitioner] contends the trial court's self-styled supplemental instruction delivered during jury deliberations contained an incorrect statement of the law, improperly instructed the jury to consider the issues in a particular order, and directed a verdict for murder.  Reviewing the instructions together with the many other instructions given in this case, as we must, we do not believe the supplemental instruction suffers any of the defects asserted by [petitioner].
>
> We begin with the circumstances under which the supplemental instruction was given.  After six and one-half hours of deliberations, the jury was deadlocked.  The foreperson inquired of the court how to proceed.  The court made some rather innocuous suggestions and asked the jury to continue to deliberate.
>
> Once the jury left, the prosecutor, concerned because many of the jurors had been smiling and laughing, asked the court to comment on the evidence to assist the jury (CALJIC No. 17.32).  The court further instructed the jurors, over defense objection, as follows: "As soon as you folks left I thought again about something that I might say to you. [¶] The Court has given you the instructions necessary to decide this matter, if you are able.  However, in your deliberations you may find it useful to start by considering the elements of the crime charged without reference to the two concepts which concern self-defense or the one which refers to heat of passion. [¶] Thereafter, consider whether the killing was unlawful, whether the killing was not justified by self-defense.  Next consider whether malice was negated, that is, was there either, one, a [*sic*] actual but unreasonable belief in the necessity of self-defense, or, two, heat of passion. [¶] On the subject of actual but unreasonable belief in the necessity of self-defense, consider whether there was actual fear of imminent peril as I have defined it for you.  Note that fear of future harm, no matter how great the fear and no matter how great the likelihood of harm, is not enough for an imminent peril. [¶] I do not intend by

> this instruction or by anything I've said or done to indicate to you what your verdict should be or that I believe or disbelieve any witness. You are the sole judges of the facts in this matter. [¶] And, again, if there is any assistance I can give you by way of instructions or reread, I'll be happy to do that. [¶] Thank you, folks. You may continue your deliberations."
>
> Later that day, the jury informed the court it had agreed to convict defendant of murder but needed "some instruction and/or guidance on how to decide 1st or 2nd degree. This is our area of indecision." The court repeated standard jury instructions without indication of degree, and a verdict of second degree murder was entered by operation of law.

(People v. Douangpangna, slip op. at 5-7.)

Petitioner raises three claims of error from the supplemental instruction. First, he contends that the supplemental instruction "misstated pertinent imminent peril instructions" and that the error is not removed by the fact that correct instructions on the principle were given at the start of deliberations. (Attachment to Petition for Writ of Habeas Corpus, filed April 20, 2001, at 11.) Second, petitioner claims that the supplemental instruction improperly instructed the jury to consider the issues in a specific order and in a manner that specifically suggested the jury eliminate consideration of petitioner's defense. (Id. at 16.) Finally, petitioner claims that the instruction was "imbalanced, impliedly directing a verdict for murder." (Id. at 19.)

The first and second challenges to the supplemental instruction are based solely on state law. (See Attachment to Petition, at 11-18.)[4] Consequently, they are not cognizable in this action. See, e.g., Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)) ("'federal habeas corpus relief does not lie for errors of state law.'").

/////

---

[4] Petitioner does cite one decision of the United States Court of Appeals for the Ninth Circuit for the proposition that "if a jury, which has declared itself to be deadlocked, returns a verdict after hearing erroneous supplemental instructions, it is likely that the erroneous instructions were the factor which produced agreement." (Attachment to Petition, at 15.) Petitioner's claim that the supplemental instruction was error, however, is entirely grounded in state law and the citation to the federal court of appeals' opinion does not transform this claim into a federal constitutional claim.

1   The third challenge was rejected by the state court of appeal, as follows:

> Again, we reject [petitioner]'s reading of the instructions and conclude that a reasonable juror would not construe the supplemental instruction as an implied directive to find murder.
>
> Unless a trial court elects to redeliver the entire package of jury instructions, a supplemental instruction, taken in isolation, is likely to sound unbalanced.  But as we have explained above, the trial court exercised its discretion to assist the jury by focusing their deliberations and highlighting the difficult concept of imperfect self-defense.  We agree with the Attorney General the supplemental instruction does not contain any improper comment.  Nor did the court single out any particular evidence.  In fact, the court expressly admonished the jurors it had not intended to indicate what their verdicts should be.  The court's comments, the context of the supplemental instruction, were brief, fair, and nonargumentative.  They offered another possible guide for reaching a verdict.  We find in this instruction no implied direction to disregard the defense nor any untoward comment on the evidence or the manner in which the jury should complete its task.

(People v. Douangpangna, slip op. at 13.)

As noted above, petitioner is only entitled to federal habeas corpus relief if the supplemental instruction rendered his trial fundamentally unfair.  After review of the entire record herein, this court finds no merit in the claim that the supplemental instruction violated petitioner's right to due process.  The state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.  The claim should be denied.

D.  Failure to Give Antecedent Threats Instruction

Petitioner's final claim is that the trial court erred in failing to give sua sponte an antecedent threats instruction.  This claim is grounded in state law.  See Attachment to Petition, filed April 20, 2001, at 22-23.  It is therefore not cognizable in this federal habeas corpus action.  See Middleton v. Cupp, 768 F.2d at 1085.

In accordance with the above, IT IS HEREBY ORDERED that the Clerk of the Court is directed to serve a copy of the court's April 14, 2005 order and a copy of these findings and recommendations on plaintiff at his address of record and at Centinela State Prison, P.O. Box 911, 2302 Brown Road, Imperial, CA 92251-0731; and

1  IT IS HEREBY RECOMMENDED that petitioner's application for a writ of
2  habeas corpus be denied.
3  These findings and recommendations are submitted to the United States District
4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
5  days after being served with these findings and recommendations, any party may file written
6  objections with the court and serve a copy on all parties.  Such a document should be captioned
7  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that
8  failure to file objections within the specified time may waive the right to appeal the District
9  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
10 DATED: April 5, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

12
doun0764.157